UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| KAREN WEIST, | ) | |
|     *Plaintiff*, | ) | |
| | ) | |
| *vs.* | ) | 2:11-cv-00198-JMS-WGH |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) ) | |
|     *Defendant.* | ) | |

### ORDER

Plaintiff, Karen Weist, applied for Disability Insurance Benefits and Supplemental Security Income benefits, alleging that she has been disabled and thus unable to work since June 2008.[1]  After a series of proceedings, including a hearing before Administrative Law Judge Angela Miranda (the "ALJ"), the Commissioner of Social Security denied her application for benefits.  Ms. Weist timely filed this action seeking judicial review of that denial.

#### BACKGROUND

**A.  Medical Records**

Ms. Weist, who was born in 1966, reported significant back pain in 2007, to Dr. Emily Adams, her primary-care physician.  [Dkt. 12-7 at 34, R. 339.]  An x-ray revealed scoliosis, with a curvature in her spine ranging from between eighteen-to-twenty degrees.  [*Id.* at 38, R. 343.]  Her right leg was also measured as being 9 millimeters (about 1/3 of an inch) longer than her left one.  [*Id.*]

---

[1] For all purposes relevant to this opinion, the two sets of benefits apply the same standards.  For ease of citation, the Court will cite the regulations governing Disability Insurance Benefits.  Parallel regulations for Supplemental Security Income can be found in 20 C.F.R. § 416.900 and *id.* §§ 416.400-.1499.

- 1 -

Over the next year and a half, she received a range of treatment from a number of providers. That treatment for her back pain included Naproxen, Vicodin, physical therapy, and a spinal injection of cortisone. [*E.g.*, dkt. 12-7 at 31, R. 336; *id.* at 34, R. 339; *id.* at 3-4, R. 308-09.] In addition to her scoliosis, she was diagnosed with spinal stenosis. [*Id.* at 32, R. 337.] She was also told that she may be a candidate for medial branch blocks and radio-frequency ablation. [*Id.* at 4, R. 309.]

In March 2008, Ms. Weist was terminated from her job as a dietary aide at a hospital, to which she had only been recently hired, due to her poor health. [Dkt. 12-7 at 91, R. 308.] Before that, she had consistent work as an order filler at Wal-Mart, in a bakery, and at a grocery store. [*See* dkt. 12-2 at 15. R. 206.]

In July 2008, following her disability application filed regarding her back pain, [*see* dkt. 12-6 at 7, R. 198], the Indiana Disability Determination Bureau sent Ms. Weist for a consultative physical examination to Dr. James Nicholai. He noted that she "seems ***unable*** to stand/walk for at least 2 hours in an 8 hour day due to her local back pain" and that "[s]he looks like she could use an assistive device." [Dkt. 12-7 at 76, R. 381 (original emphasis).] Dr. Jonathan Sands, a state reviewing physician, rejected Dr. Nicholai's opinion as unsupported by the evidence. [*Id.* at 85, R. 390.] Dr. Sands did not elaborate on that conclusion. [*See id.*]

Shortly thereafter, in October 2008, Ms. Weist was sent to Dr. Suzanne Leiphart for a psychological evaluation. Dr. Leiphart diagnosed Ms. Weist with depressive disorder NOS, attention deficit disorder, and assigned her a GAF score of 53.[2] Dr. Stacia Hill reviewed the report

---

[2] The GAF, or global assessment of functioning, represents the overall functionality of an individual. "[A] GAF between 51 and 60 reflects [m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Jelinek v. Astrue*, 662 F.3d 805, 807 (7th Cir. 2011) (quotation omitted).

and agreed with the diagnoses. [*See* dkt. 12-7 97, R. 402; *id.* at 99, R. 404.] Dr. Hill concluded that Ms. Weist had moderate "[d]ifficulties in [m]aintaining [c]oncentration, [p]ersistence, or [p]ace." [Dkt. 12-7 at 106, R. 411.]

In November 2008, Ms. Weist saw Dr. Keith Landry, for her depression. [*Id.* at 119, R. 424.] He noted that she "would like to discuss possible use of cane." [*Id.*] He "explained that she needs to choose one primary care physician to manage her care" to achieve "optimal care." [*Id.* at 120, R. 425.] Although he also recommended "chiropractics, … she states that she can't afford [it] right now." [*Id.*]

Over the following months, until her July 2010 hearing before the ALJ, Ms. Weist continued visiting multiple doctors for treatment of her back pain, resulting in multiple prescriptions and tests. For example, in October 2009, Dr. Troy Quiz prescribed a walker with wheels to help Ms. Weist ambulate more effectively. [*Id.* at 134, R. 439.] The following month he confirmed in a medical questionnaire that, in his view, the assistive device was medically necessary. [*Id.* at 136, R. 441.] And in January 2010, Ms. Weist visited Annette Copeland, a nurse practitioner operating under the supervision of Dr. Ronald Miller, for a wheelchair evaluation. [Dkt. 12-8 at 42-43, R. 483-84.] After conducting the evaluation, Ms. Copeland recommended a power wheelchair. [*Id.* at 43, R. 484.] Although Medicaid had previously denied the request, Ms. Weist successfully appealed the denial in March 2010; Dr. Shahram Akhavan approved her request for a powered wheelchair. [Dkt. 12-9 at 12, R. 495.] Ms. Weist's podiatrist, Dr. Irwin Malament, would later submit a statement to the ALJ that, based upon his previous examination of her, he believes that she requires an assistive device in order to stand or walk. [Dkt. 12-9 at 18, R. 501.]

Ms. Weist also received additional treatment for her psychological conditions. In December 2009, she went to Cummins Behavioral Health Systems. [*Id.* at 7, R. 490.] Her GAF

was reported as a 49. [*Id.* at 10, R. 56.] She also began seeing Dr. Joseph Herr, a neurologist, for complaints of memory loss. [*See* dkt. 12-8 at 27, R. 468.] In the course of his evaluation, he noted that she uses a "quad cane held right hand w/resultant exaggerated lean of body weight on-to right arm. When cane switched to left side upon request, same thing on left side." [Dkt. 12-8 at 28, R. 469.] By March 2010, he reported that [h]er depression is improved w/treatment, back pain mildly improved." [*Id.* at 34, R. 517.] A social worker performing a home visit reported in May 2010 that Ms. Weist had memory difficulties. [Dkt. 12-9 at 23, R. 506.]

### B. The Hearing

Ms. Weist testified at her hearing. She explained that her pain began in 2005 and became progressively worse. [Dkt. 12-2 at 62-63, R. 61-62.] She testified that she had to begin using a cane and later a walker in 2008, and currently uses her wheelchair at home. [*Id.* at 66, R. 65.] She can do about 10% of the housework at home—dishes, sweeping, and mopping, in short bursts. Her daughter does the rest. [*Id.* at 66-68, R.65-67.] She can walk about 10-15 feet on her own at a time. [*Id.*]

The ALJ heard from a vocational expert. The ALJ posed a series of hypotheticals to the vocational expert, about the work prospects for individuals with various characteristics. None of the hypotheticals explicitly included limitations on concentration, persistence, and pace. [*See id.* at 78-80, R. 77-79.] One did, however, include a restriction for "simple, routine work." [*Id.* at 76, R. 75.]

### C. The ALJ's Decision

The ALJ found that Ms. Weist suffers from a multiple severe physical and psychological impairments:

> back dysfunction variously described as mild facet degeneration at L4-S1, mild
> bilateral foraminal narrowing at L4T-L5, small annual tears L3-L4 on left, mild

> lumbar lordosis, spinal stenosis, and degenerative joint diseases; scoliosis; tobacco abuse; leg length discrepancy; alcohol abuse; and mental impairments variously described as depression, adjustment disorder with mixed anxiety and depressed mood, posttraumatic stress disorder, and bipolar disorder (provisionally).

[Dkt. 12-2 at 34, R. 33.]

Given those limitations, and as is relevant here, the ALJ found that Ms. Weist had the ability to perform sedentary work—i.e. "to stand and/or walk up to 2 hours in an 8-hour workday and … to sit up to 6 hours in an 8-hour workday," [*id.* at 37-38, R. 36-37]—subject to certain limitations, including having "moderate difficulties" with "concentration, persistence or pace," [*id.* at 36, R. 35].

The ALJ specifically rejected Ms. Weist's claimed need for an ambulatory device, finding it not "medically necessary." [*See, e.g.*, *id.* at 39, R. 38.] On the basis of the vocational expert's testimony, the ALJ found that Ms. Weist was not disabled because Ms. Weist could still work as a general office clerk, a hand packer, and an assembler. [*Id.* at 44, R. 43.]

## STANDARD OF REVIEW

Applicable law gives this Court only a limited role in reviewing denials of disability benefits: ensuring that "the ALJ applied the correct legal standard, and [that] substantial evidence supports the decision." *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004) (citation omitted). For the purposes of judicial review, "[s]ubstantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation omitted). Because the ALJ "is in the best position to determine the credibility of witnesses," *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008), the Court must afford the ALJ's credibility determinations "considerable deference," overturning them only if they are "patently wrong," *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) (quotations omitted). But "ALJs must not succumb

to the temptation to play doctor and make their own independent medical findings." *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) (citations omitted).

If the ALJ committed no legal error and substantial evidence exists to support the ALJ's decision, and if the ALJ has also built a "logical bridge" between the ALJ's findings and the evidence, *e.g.*, *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009) (citation omitted), the Court must affirm the denial of benefits. Otherwise the Court must generally remand the matter back to the Social Security Administration for further consideration; only in rare cases can the Court actually order an award of benefits. *See Briscoe v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005).

When evaluating claims for disability benefits, ALJs undertake a five-step, sequential inquiry. They ask:

- *Step 1:* Is the claimant currently employed?
- *Step 2:* Does the claimant have a severe physical or mental impairment?
- *Step 3:* Does the claimant have an impairment that meets or equals one that the Commissioner has decided are automatically disabling in 20 C.F.R., Subpart P, Appendix 1?
- *Step 4:* Can the claimant perform his or her past relevant work given his or her residual functioning capacity ("RFC")?
- *Step 5:* Can the claimant perform any other work in the national economy given that RFC and given the applicant's age, education, and work history?

*See, e.g.*, *Zurawski v. Halter*, 245 F.3d 881, 885 (7th Cir. 2001) (citations omitted). An answer of yes at one step leads to the next step, except at Steps 3 and 5 where an answer of yes means that the applicant is disabled. *Id.* At Steps 1-4, the applicant bears the burden; at Step 5, the ALJ bears the burden. *Id.*

**DISCUSSION**

On appeal, Ms. Weist challenges the ALJ's RFC finding and his finding at Step 5. The Court will examine those issues in turn.

**A.  The ALJ's RFC Finding**

The RFC represents "the most [that the claimant] can still do despite [all] limitations" after consideration of "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(1). That evidence necessarily includes "all … medically determinable impairments" indicated in the record. *Id.* at § 404.1545(a)(2).

The bulk of Ms. Weist's challenge to the RFC determination concerns the ALJ's finding that Ms. Weist does not need an assistive device. She also briefly argues that the ALJ should have obtained updated medical opinions about her mental health and that the ALJ made misrepresentations of or otherwise speculated about the evidence.

*1.  The Need for an Assistive Device*

Ms. Weist argues, under several different theories, that when the ALJ opined that her use of an assistive device "is not medically determined to be necessary," [dkt. 12-2 at 35, R. 34], the ALJ impermissibly "succumb[ed] to the temptation to play doctor and make [her] own independent medical findings," *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) (citations omitted). Ms. Weist is correct. When Dr. Nicolai conducted a consultative examination of Ms. Weist for the Commissioner in 2008, he noted: "[S]he looks like she could use an assistive device." [Dkt. 12-7 at 76, R. 381.] That opinion is consistent with Dr. Quiz's 2009 decision to prescribe a walker for Ms. Weist. [Dkt. 12-7 at 134, R. 439.] It is also consistent with the 2010 opinion of Nurse Practitioner Annette Copeland, who recommended a power wheelchair for Ms. Weist after examining her. [Dkt. 12-8 at 43, R. 484.] Furthermore, Dr. Nicholai's opinion is al-

so consistent with that of Dr. Akhavan, a board-certified physician in family medicine. [Dkt. 12-9 at 12, R. 495.] Upon review of her file in 2010, Dr. Akhavan decided to approve Ms. Weist's request for a powered wheelchair, thus overturning Medicaid's previous denial of that request. [*Id.*] And it is also consistent with the 2010 opinion of Ms. Weist's podiatrist, Dr. Malamet, that she "must…use a cane or other assistive device" when standing or walking. [Dkt. 12-9 at 18, R. 501.]

Despite the numerous treating or examining sources who believed that Ms. Weist needed an ambulatory device, the ALJ chose to rely upon the 2008 state reviewing physicians' review of Ms. Weist's file, which did not yet include the opinions of Dr. Quiz, Ms. Copeland, Dr. Nicholai, or Dr. Akhavan. [*See* dkt. 12-7 at 85-86, R. 390-91.] "A contradictory opinion of a non-examining physician does not, by itself, suffice" to reject the opinions of examining sources. *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) (citation omitted). Rather than obtaining an updated consultative opinion, *see* 20 C.F.R. § 416.919a(b), or summoning a medical expert to interpret the reasons for the multiple recommendations for ambulatory devices, *see id.* § 416.927(a), the ALJ dismissed the examining physicians' opinions, for a variety of reasons. Some of those reasons were clearly within the province of the ALJ, for example the apparent inconsistent use of the ambulatory devices that she received. But, problematically, the ALJ also sought to dismiss medical findings—that resulted in a prescription for an ambulatory device and that the state reviewing physicians did not examine—as "unremarkable." [Dkt. 12-2 at 39, R. 38.] The ALJ characterized an "exaggerated lean" before Dr. Herr, when being examined for memory loss in 20120, as evidence of malingering with respect to Ms. Weist's back pain, [*id.* at 40, R. 39], even though Dr. Herr himself did not reach that conclusion, [*see* dkt. 12-8 at 28, R. 469], and even though she was prescribed a wheelchair by Ms. Copeland two weeks later. And

the ALJ pronounced without authority that Dr. Nicholai's opinion about the need for an assistive device "is not consistent with his own clinical examinations." [Dkt. 12-2 at 43, R. 42]. Those latter characterizations of the evidence are medical determinations that the ALJ, who is not a doctor, was not entitled to make. A remand is, therefore, required, for further development of the medical record with respect to Ms. Weist's possible need for an assistive device, with the benefit of an updated medical opinion.

### 2. *Updating Medical Opinions Regarding Ms. Weist's Mental Health*

To the extent that Ms. Weist argues that a new psychiatric review was necessary, [*see* dkt. 16 at 32], the Court finds a remand on that basis inappropriate. First, Ms. Weist's Reply brief contains only a passing reference to her RFC challenge about her mental health. [*See* dkt. 21 at 2 ("She explained that both her mental and physical conditions deteriorated and that she was in pain.").] Her failure to substantively reply to the Commissioner's arguments justifies a summary rejection of her position. *See Becker v. Porter County Sheriff's Dep't*, 2009 U.S. Dist. LEXIS 15749 *14 (N.D. Ind. 2009) ("[T]he Plaintiff failed to address his Eighth Amendment claim in his reply, and has thereby abandoned this claim." (citation omitted)). Second, to the extent that Ms. Weist intends to continue to press her argument, the Court finds that Ms. Weist's argument fails on the merits. Although the state reviewing physician did not have the records from Cummins Behavioral Health and Dr. Herr, because they had not yet been created, she has directed the Court to nothing in them so indicative of deterioration as to make the original review invalid, especially given her own testimony about her abilities and, in the unchallenged characterization of the ALJ, the "inconsistent and sporadic complaints" that she made about her mental condition, [dkt. 12-2 at 42, R. 41].

### 3. *Misstatements of or Speculations About the Evidence*

Ms. Weist also argues that the ALJ's opinion reveals instances of misstatements of or speculations about the evidence. Given that the Court has already ordered a remand and given that any errors will become moot once a new hearing is held, the Court need not discuss them in any detail. Ms. Weist's counsel will, no doubt, ensure that the evidentiary record is sufficient so that the ALJ can make the appropriate findings about the record.

The Court will, however, mention the most serious of the problems identified: Ms. Weist claims that the ALJ was wrong to draw a negative inference from the fact that only one of her doctors specifically agreed to provide an opinion about her abilities. [*See* dkt. 12-2 at 43, R. 42 ("Of note, many treating sources declined to provide an opinion on the claimant's functional ability.").] For the ALJ to legitimately draw a negative inference from that fact, the ALJ would need to build the requisite logical bridge; the ALJ would need to find as a matter of fact that Ms. Weist asked but the doctors refused to provide an opinion because it would undercut her position, or that she did not ask because she knew what they would say. At present, that logical bridge is lacking.

### B. The ALJ's Finding at Step 5

Ms. Weist claims that, in two ways, the ALJ erred at Step Five by failing to include in the hypothetical to the vocational expert all of her limitations. *See, e.g.*, *Schmidt v. Astrue*, 496 F.3d 833, 846 (7th Cir. 2007) (explaining that an ALJ must "incorporate into his hypotheticals those impairments and limitations that he accepts as credible").

First, she says that the ALJ should have included an assistive device in the hypothetical. Because the Court has decided that a remand is necessary for further development of the record with respect to her possible need for an assistive device, it would be premature to assign error on

that basis; the Commissioner may conclude on remand that she does not need such a device after all. If Ms. Weist does in fact require an assistive device, that limitation should be presented to a vocational expert.

She is, however, correct that her second claimed error also necessitates a remand. Although the ALJ found that she had limitations in concentration, persistence, and pace, the ALJ did not specifically include them in the hypothetical, instead limiting Ms. Weist to "simple, routine work." [Dkt. 12-2 at 76, R. 75.] The parties agree, [dkt. 16 at 35; dkt. 17 at 10], that under Seventh Circuit case law, limitations to simple repetitive work do not account for limitations in concentration, persistence, and pace—thus making the ALJ's hypothetical incomplete. *See, e.g.*, *O'Connor-Spinner v. Astrue*, 627 F.3d 619-20 (7th Cir. 2010). They also agree, [dkt. 16 at 35; dkt. 17 at 10], that under Seventh Circuit case law, a remand will be required under the circumstances here unless "it [is] manifest that the ALJ's alternative phrasing specifically excluded those tasks that someone with the claimant's limitations would be unable to perform." *O'Connor-Spinner*, 627 F.3d at 619. The Commissioner's only attempt to surmount that high standard relies upon post-hoc argumentation; the Commissioner argues why the ALJ could have decided that evidence in the file established the appropriateness of the limitation that the ALJ used. But post-hoc argument is forbidden. *SEC v. Chenery Corp.*, 318 U.S. 80, 93-95 (1943).[3] A remand at Step 5 is, therefore, also required.

---

[3] Additionally, the Court notes that the Seventh Circuit is skeptical that depression-related conditions—which Ms. Weist has—can satisfy this high standard necessary to avoid a remand. *See O'Connor-Spinner*, 627 F.3d at 619-20 (explaining that hypotheticals most likely to meet the standard are those involving stress or panic and going on to hold that "it is not clear whether the hypothetical, which included a restriction to repetitive tasks with simple instructions, would cause the VE to eliminate positions that would pose significant barriers to someone with the applicant's depression-related problems in concentration, persistence and pace.").

## CONCLUSION

Accordingly, the Court **VACATES** the decision denying Ms. Weist benefits and **RE-MANDS** this matter back to the Commissioner for further proceedings, pursuant to 42 U.S.C. § 405(g) (sentence four).

03/21/2012

*[signature: Jane Magnus-Stinson]*

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only:**

Timothy E. Burns
KELLER & KELLER
timb@2keller.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

Annette Lee Rutkowski
KELLER & KELLER
annette@2keller.com